UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| | § | |
| v. | § | CRIMINAL ACTION H-20-00161 |
| | § | |
| | § | |
| JESUS LEONARDO ESQUIVEL CARRIZALES | § | |
| *in custody* | | |

## Order

Pending before the court is a motion to suppress evidence filed by defendant Jesus Leonardo Esquivel-Carrizales ("Esquivel"). Dkt. 34. The United States of America (the "Government") filed a response, and Esquivel replied. Dkts. 37, 42. On June 24, 2020, the court held a hearing on the motion. Dkt. 67. At the hearing, the parties agreed to submit post-hearing briefs. *See* Dkt. 63. The parties agreed to a briefing schedule (Dkt. 70), and Esquivel filed a supplemental brief on September 8, 2020 (Dkt. 71), the Government responded on September 28, 2020 (Dkt. 72), and Esquivel replied on October 9, 2020 (Dkt. 73). After considering all of this briefing, the testimony and evidence presented at the hearing, and the applicable law, the court is of the opinion that the motion to suppress should be GRANTED IN PART AND DENIED IN PART.

### I. BACKGROUND

On March 12, 2020, Esquivel, along with his co-defendant Jose Santos-Esquivel ("Santos"), was indicted for the federal offenses of (1) conspiracy to possess with the intent to distribute a controlled substance; and (2) possession with intent to distribute a controlled

1

substance.[1]  Dkt. 1.  In his original motion to suppress, he sought to suppress (1) "the currency, and any other evidence (including statements), and any fruits thereof, that were allegedly obtained following his seizure and search of a vehicle in which he was traveling in Mississippi . . . on May 17, 2018"; and (2) "the controlled substances, firearms, currency, and any other evidence (including statements), and fruits thereof, that were allegedly obtained following his seizure and the search of a vehicle in which he was traveling . . . on December 20, 2018," asserting that the evidence was obtained in violation of the Fourth Amendment.  Dkt. 34.  He also moves to suppress "any custodial statements, and any testimonial fruits flowing from them, because they were made without him knowingly, intelligently, and voluntarily waiving his rights under *Miranda v. Arizona*," in violation of the Fifth and Sixth Amendments.  *Id.*

The Government contended in its original response that (1) Esquivel was never arrested on May 17, 2018, and he denied ownership of the currency at issue; and (2) Esquivel was a passenger on December 20, 2018, and thus has no standing to challenge the search occurring on that date.  Dkt. 37.  Esquivel filed a reply in which he sought an evidentiary hearing and the opportunity to question the officers involved.  Dkt. 42.

During the evidentiary hearing held on June 24, 2020, the following officers testified: Clifton (Gene) Dedeaux, K. Winter, L. Hall, P. Oliphant, A. Rodgers, and Deputy Sweeney.  Dkts. 63 (Transcript), 67 (Minute Entry).  The parties filed supplemental briefs pursuant to an agreed briefing schedule after the hearing.  Dkts. 70 (briefing schedule), 71, 72, 73.  The court will

---

[1] Esquivel was originally indicted by a State of Texas grand jury on March 18, 2019, and agreed to various continuances in that case; at the time of his federal indictment, his state-court case had been continued until April 7, 2020.  *See* Dkt. 39.

2

now set forth the facts that were ascertained during the hearing along with the arguments in the supplemental briefs.

### A. May 17, 2018 Stop

#### 1. Testimony

On May 17, 2018, Officer Clifton (Gene) Dedeaux was working for the D'Iberville Police Department, which is near Biloxi, Mississippi. Dkt. 63. He had worked as a police officer for over thirty years. *Id.* His title with the D'Iberville Police Department was and currently is Highway Criminal Interdiction Patrol, and he is on the High Intensity Drug Activity ("HIDA") Task Force. *Id.* He testified that the goal of the task force is "to interdict narcotics trafficking and bulk cash smuggling across the I-10 corridor." *Id.*

At approximately 9:30 a.m. on May 17, 2018, Dedeaux was on I-10 and observed a Volkswagen Passat pass him heading westbound. *Id.* He testified that the car "had what I would say a paper tag on the back of it, that was unreadable, because the wind had – it was flopping up as it was going down the highway." *Id.* Dedeaux testified that Mississippi law requires tags be readable at all times.[2] *Id.* Dedeaux stopped the vehicle and made contact with the driver from the passenger side of the vehicle; Dedeaux identified Esquivel as that driver of the Passat during the suppression hearing. *Id.*

During cross, it was pointed out that Dedeaux's report states that "a silver VW Passat [was] displaying a temp paper tag . . . [and Dedeaux] conducted a traffic stop . . . to verify the temp tag and the purchase of the vehicle." *Id.* Dedeaux testified that he "could not tell it was actually a temp tag until [he] got behind it," and when the car stopped, "the paper fell in place." *Id.* He

---

[2] The Government drew the court's attention to Mississippi Code Title 27. *See* Dkt. 63.

3

testified that if he would have been able to run the numbers, he would not have had to pull the car over.  *Id.*  Dedeaux contends that he told Esquivel that he needed to go to the next exit and tape down the tag.  *Id.*  Dedeaux did not write that the tag was flailing in the wind or specify that he could not read it in his report, and his office was unable to recover dash camera video from that date by the time it was requested by the Government, as they do not retain the videos indefinitely. *Id.*

Dedeaux testified that when he made contact with Esquivel, Esquivel "was very nervous," "kind of squirming and his – and his arms and hands were shaking."  *Id.*  Dedeaux conceded that "people get nervous when they get pulled over by the police department," but "this gentleman was very nervous, over-nervous."  *Id.*  Dedeaux asserts that he first explained to Esquivel that he pulled him over because the tag was flopping and he could not read it.[3]  *Id.*  He asked for Esquivel's license and registration of the vehicle for the proof of purchase.  *Id.*  The paperwork Esquivel initially handed Dedeaux was for a pickup.  *Id.*  According to Dedeaux, when he told Esquivel it was not the right paperwork, Esquivel "started panicking and looking, and went in the glove box, started pulling out paperwork . . . ."  *Id.*  Esquivel finally found papers for the Volkswagen Passat, but Esquivel's name was not on the documentation.  *Id.*  Dedeaux asked Esquivel if he owned the car, and, according to Dedeaux, Esquivel replied that it belonged to his friend who had let him borrow it to go to Atlanta, Georgia to visit his dad.  *Id.*  Dedeaux stated that he believed Esquivel told him the friend's name was Alonzo, and Dedeaux advised Esquivel that Alonzo's name was not on the paperwork either.  *Id.*  According to Dedeaux, Esquivel then said that it belonged to a

---

[3] Dedeaux could read the tag after Esquivel stopped, but he testified that it was a violation for it not to be secured to where it could be read while driving.  *Id.*  He was not planning to ticket him; he just wanted to advise him of the "violation" and verify the tag.  *Id.*

friend of Alonzo's, whose name was on the paperwork.  *Id.*  Dedeaux testified that Esquivel did

not know the name of the owner of the vehicle.  *Id.*  Dedeaux claims that he spoke to Esquivel in

English, and Esquivel spoke to him in English.[4]  *Id.*

After obtaining the correct papers, Dedeaux went to confirm that the paperwork matched

the VIN number on the paper tags and to run the tags to confirm that the vehicle was not stolen.

*Id.*  He also ran a check on Esquivel to make sure there were no warrants.  *Id.*  Dedeaux ran the

check on Esquivel through the El Paso Intelligence Center (EPIC) database.  *Id.*  Dedeaux testified

that the EPIC search showed that the defendant "did have a past history of drugs."  *Id.*  Dedeaux

further testified that this information, combined with Esquivel being so nervous, driving a third-

party vehicle, not knowing the owner of the vehicle's name, not having luggage in the car despite

saying he'd been traveling to Georgia, and fast-food wrappers on the front seat, gave him probable

cause to believe there was a crime being committed in his presence.  *Id.*

Dedeaux next approached the vehicle again, from the passenger side, and asked Esquivel

to step to the rear of the vehicle, which Esquivel did.  *Id.*  Dedeaux stated that he read a consent

form to Esquivel, or asked Esquivel to read it, and asked Esquivel if he would consent to a search

of the vehicle.[5]  *Id.*  Dedeaux asserted that Esquivel said he understood the consent form and signed

the consent form, thus giving consent to search.  *Id.*  Dedeaux did not recall if the form was in

English or Spanish, but he did recall asking Esquivel if he understood it and Esquivel replying in

the affirmative.  *Id.*  According to Dedeaux, the consent form states that the person whose car is

---

[4] During cross, Dedeaux testified, when asked if he was aware that Esquivel "doesn't speak English well" that Esquivel "spoke it good that day.  Perfectly."  *Id.*  Dedeaux contends that he "understood everything [Esquivel] said and [Esquivel] understood everything [Dedeaux] said."  *Id.*
[5] During cross, Dedeaux stated that Esquivel read the consent form himself.  *Id.*  He said he then asked Esquivel if he understood the consent form, and Esquivel said yes.  *Id.*

being searched has the right to refuse and the right at any time to stop the search. *Id.* Dedeaux testified that he no longer had the consent form that Esquivel signed because he turned the consent form and all records over to the Drug Enforcement Agency ("DEA"). *Id.* Dedeaux placed Esquivel in the passenger side of his police vehicle during the search of the Passat "for officer safety." *Id.* Dedeaux states that the door of the police vehicle was unlocked. *Id.*

During the search, Dedeaux found an aftermarket compartment, and there were bundles of currency in the compartment. *Id.* He then advised his dispatch that he had located currency and asked them to contact DEA Agent Winters and Border Patrol Agent Levi Hall. *Id.* Dedeaux then went to Esquivel and explained that he had found currency in the car. *Id.* According to Dedeaux, Esquivel said he "knew nothing about the money being there." *Id.* Dedeaux explained that DEA and a Border Patrol agent were coming, placed handcuffs on Esquivel (in the front), shut the door, and got into the driver's seat of the car to wait.[6] *Id.* When the other officers arrived, they determined it would be safer to finish searching the car at the police department as opposed to on the side of the highway. *Id.* So, another officer drove the Passat to the police station, and Esquivel was transported to the station in Dedeaux's police car. *Id.*

On the way to the police station, Dedeaux states that Esquivel asked why DEA was called, and Dedeaux told Esquivel that it was because the officer works cases for the D'Iberville Police Department and will need to provide a receipt to Esquivel if he seizes the currency. *Id.* Esquivel then allegedly shared some information about his family's past that raised concern about Esquivel "losing the money." *Id.*

---

[6] Dedeaux testified during cross that he placed handcuffs on Esquivel at this point because he had found the currency and did not "know what was going on . . . [didn't] know if he just robbed a bank . . . . So, for officer safety, I handcuffed him." *Id.* Agent Winter testified that he did not recall Esquivel being handcuffed. *Id.*

Dedeaux contends that he removed the handcuffs as soon as they got to the police department. *Id.* Dedeaux testified that Esquivel was never under arrest and was always free to leave, and that Esquivel never asked Dedeaux if he could leave. *Id.* Dedeaux further stated that the consent form that he read to Esquivel explained that Esquivel was free to leave. *Id.*

Agent Karl Winter is a detective with the D'Iberville Police Department, and he is assigned to the DEA Task Force, which is a HIDA group. *Id.* He has been a police officer since 1979 and has worked for the DEA Task Force for about ten years. *Id.* Before the Task Force, he was a special agent with the DEA for about twenty-seven years. *Id.* On May 17, 2018, Winter was on I-10 between Gulfport, Mississippi, and D'Iberville when he heard the call that Dedeaux had stopped Esquivel's vehicle, and he headed to the location of the stop. *Id.* He spoke with Dedeaux when he arrived; Esquivel's vehicle was stopped where two lanes are merging onto the Interstate, which has three lanes, and Winter thought it was safer for everyone if they just moved to the police station, which he testified was "a couple of minutes away." *Id.*

When they got to the police station, Winter and Esquivel went to a small room,[7] and Winter asked Esquivel if he wanted to sit down while he counted the money, prepared the receipt for the money seizure, and confirmed Esquivel's address so that the DEA could send him a letter in case he wanted to contest the seizure. *Id.* Winter testified that Esquivel was free to go during this time period, and he told Esquivel he was free to go. *Id.* Winter noted that, in addition to the money that was found in the car, which was $157,000, Esquivel had about $900 in his pocket. *Id.* Esquivel was allowed to keep the money that was in his pocket. *Id.* While Winter and Esquivel were in the small room, Dedeaux was completing the search of the vehicle. *Id.*

---

[7] According to testimony during the hearing, the room was about the size of a jury box. *Id.*

Winter testified that he asked Esquivel questions as he was completing the paperwork.  *Id.* He spoke to Esquivel in English and Esquivel "seemed to understand everything [Winter] asked him, and [Winter] could understand what [Esquivel] was saying to [him]."  *Id.*  Winter stated that there "was no language barrier."  *Id.*  Winter asked Esquivel how he got involved with the vehicle, and Esquivel told him somebody named Lorenzo drove him to the airport to go to Virginia to pick the vehicle up.  *Id.*  When he got to Virginia, he was met by a Black male who handed him the keys to the vehicle.  *Id.*  Esquivel told Winter he was going to drive the vehicle to Marietta, Georgia to visit his father.  *Id.*  Esquivel told Winter that he did not know anything about the money that was found in the car.  *Id.*  Winter asked Esquivel about the $900 in his pocket, and Esquivel stated that it was from his income tax return.  *Id.*  Winter then said to Esquivel that he thought Esquivel was not a citizen and was an unemployed construction worker and asked how he got an income tax return.  *Id.*  At that point, Esquivel terminated the conversation.  *Id.*

According to Winter, once Dedeaux completed his search, he came back in, and they counted the money and gave Esquivel his receipt.  *Id.*  At first Winter stated that Esquivel was "then free to go," but he clarified to say "he left at that time [and] was free to go whenever he wanted to leave."  *Id.*

Dedeaux testified that he passed the investigation off to Winter.  *Id.*  Winter's report to the DEA database states that Esquivel was stopped for driving with a paper license tag.  *Id.*  Winter testified that when Dedeaux handed the investigation over, he believes he had a consent to search document and a copy of a police report that Dedeaux wrote.  *Id.*  Winter testified that Dedeaux may have also included insurance information from the vehicle.  *Id.*  Winter stated that because it was simply a money seizure case and was closed in January, the documents were destroyed.  *Id.*

He testified that he did not know the Assistant U.S. Attorney was going to be needing any of the documents until June 2020.  *Id.*

Before Esquivel left the police station, Dedeaux spoke with him again.  *Id.*  Dedeaux asked Esquivel if he would like to be a confidential informant, explained to him how it worked, and gave him a card.  *Id.*  According to Dedeaux, Esquivel expressed interest.  *Id.*  Dedeaux also stated that Esquivel shared that the group he worked for only used Volkswagens because there are good places for compartments.  *Id.*  Dedeaux stated that Esquivel later sent him a text with a picture of a maroon Volkswagen Passat that had three Doberman pinschers on it.  *Id.*  Dedeaux claims he sent a thumbs up back.  Additionally, Esquivel allegedly called Dedeaux one time.  *Id.*  However, Dedeaux no longer has anything that was on his cell phone during that time period because his phone was damaged.  *Id.*

Agent Levi Hall has worked for U.S. Border Patrol for twelve years—eight in Laredo, Texas, and four in Gulfport, Mississippi.  *Id.*  Hall is a K-9 handler who typically works I-10 backing up Mississippi state troopers, D'Iberville police, and the Jackson County MET Team.  *Id.*  He is part of the D'Iberville Task Force.  *Id.*  He testified that his dog can find drugs or concealed humans.  *Id.*  On May 17, 2018, Hall was called by the D'Iberville Police Department to run his drug dog on the vehicle stopped by Dedeaux.  *Id.*  The dog alerted to the odors of narcotics in the area where Dedeaux had found the money under the gear shifter.  *Id.*

Hall had the opportunity to speak with Esquivel while he was putting his dog away.  *Id.*  Hall recalls Esquivel stating that "they use that car a lot, and that they had another car of the same type, different color, that they were going to start using."  *Id.*

### 2.  Supplemental Arguments

In his post-hearing supplemental brief, Esquivel argues that the initial "seizure" of Esquivel was not supported by reasonable suspicion because he was stopped for displaying a temporary tag, which is not a violation of the law.  Dkt. 71.  Esquivel further argues that the stop was impermissibly prolonged.  *Id.*  Finally, Esquivel argues that the Government has not met its burden to show that Esquivel knowingly and voluntarily consented to the search of the vehicle.  *Id.* Esquivel additionally contends that any statements made by Esquivel on May 17, 2018, were obtained in violation of *Miranda v. Arizona* because they were made during a custodial interrogation and Esquivel was not read his *Miranda* rights.  *Id.*

The Government points out that Dedeaux articulated a valid reason for the stop—the paper tag that was unreadable because it was flapping in the wind.  Dkt. 72.  The fact that the reports said Esquivel was stopped to "verify the temp tag" does not mean it was not flailing.  *Id.*  The Government asserts that Dedeaux's testimony was credible and the court should credit it.  *Id.*  The Government additionally argues that the stop was not unreasonably prolonged because Esquivel consented to the search.  *Id.*  The Government contends, moreover, that additional reasonable suspicion arose before the initial purpose of the stop had been fulfilled.  *Id.*  The Government points out the Dedeaux informed Esquivel that he was not under arrest and could terminate the consent at any time.  *Id.*  Both Dedeaux and Winter testified that Esquivel spoke English well.  *Id.* Moreover, Esquivel denied knowledge of the contraband.  *Id.*  The Government contends there was no custodial interrogation because Esquivel was repeatedly told he could leave at any time and, in fact, terminated the conversation with Winter at one point.  *Id.*

Esquivel contends in his supplemental reply that the notion of a flailing or flying tag is not credible or reliable because the information was not included in three law enforcement reports, no

10

ticket was issued for this violation, and the dash camera evidence was not preserved.  Dkt. 73.

Esquivel argues that the Government's evidence that it could continue the stop does not rise to

reasonable suspicion that a crime was afoot.  *Id.*  Finally, Esquivel asserts that the consent form,

which was likely written in English, was unjustifiably destroyed, and the Government cannot meet

its burden of showing that consent was voluntarily given.  *Id.*  Finally, Esquivel contends that a

reasonable person would have believed he was in custody when his car was seized and he was

placed in the backseat of a police car, handcuffed, taken to a police station, and interviewed in a

small room the size of a jury box.  *Id.*  Since Esquivel was never read his *Miranda* rights on this

date, he contends any statements he made cannot be used against him.  *Id.*

### B.  December 20, 2018 Stop

#### 1.  Testimony

On December 20, 2018, Eric Sturgeon, Nick Stoltz, and Patrick Oliphant were all agents

employed by Homeland Security Investigations ("HSI") in Brownsville, Texas.  Dkt. 63 (Oliphant

Direct).  At that time, Sturgeon was the main agent on this case, but he has since transferred to a

different state, and Oliphant is now the lead agent.  *Id.*  HSI had identified several people who

were in the commercial cargo business driving 18-wheelers, including Santos (Esquivel's co-

defendant).  *Id.*  According to Oliphant, at some point in the fall of 2018, a confidential informant

advised HSI that Santos was looking for a compartment to be produced to conceal narcotics.  *Id.*

The informant built the compartment in an external diesel tank for Santos.  *Id.*  Sturgeon got a

tracking warrant and attached a GPS tracker to a vehicle that was frequently driven by Santos; the

hidden diesel tank was seen in the back of this vehicle.  *Id.*

On December 20, 2018, Sturgeon and another special agent were monitoring the GPS

tracker, and it moved out of their jurisdiction towards Houston.  *Id.*  HSI Brownsville advised HSI

Houston to proceed with surveillance, if possible, to see who Santos meets. *Id.* Oliphant testified that "from Brownsville to Houston is pretty much the main destination for narcotics." *Id.* He testified that it was common for drug traffickers to use a hidden compartment coming up from the Rio Grande Valley, and he suspected Santos was trafficking narcotics based on the compartment and his past associations with individuals who have been arrested for narcotics trafficking or bulk cash smuggling. *Id.*

Special Agent Aaron Rogers with HSI Houston has been with HSI for sixteen years. *Id.* He testified that on December 20, 2018, he was contacted by an agent from Brownsville who said there was a vehicle headed towards Houston that was "possibly loaded with narcotics." *Id.* There was a tracker on the vehicle and the HSI Houston team went on surveillance and, using the GPS tracker, located the vehicle on Westheimer and Post Oak in a shopping center parking lot. *Id.* The time was around 10:00 p.m. *Id.* The vehicle was a Dodge pickup truck, and it was backed into a parking spot. *Id.* Agents observed a white Volkswagen vehicle about a space or two over from the truck, and two guys were talking to the driver of the truck. *Id.* These two individuals were associated with the white car and had come out of one of the stores with some things they had bought and put them in the trunk of the white car. *Id.* Rogers testified that the two men in the white car had "taken something out of the truck" and they "were walking back and forth talking to that guy." *Id.* Rogers later described the "something" that was taken out of the truck as a "box"; a different agent (Agent Pestoni) observed this transfer, not Rogers.[8] *Id.* It was taken out of the truck, backseat passenger side, and put in the trunk of the Volkswagen. *Id.* The individuals who

---

[8] Agent Pestoni did not testify. Rogers reported that Pestoni said Pena got "something out of the backseat" but he was not sure if Pestoni could see exactly what it was." *Id.*

had been in the store and were associated with the car were Esquivel and Alejandro Pena, and the person in the truck was Santos. *Id.*

Rogers identified Esquivel in court. *Id.* Rogers testified that at one point Esquivel got into the truck and appeared to have a conversation with Santos for about ten to fifteen minutes, got back out, and arranged some stuff in the trunk of the white car. *Id.* Rogers testified that he and the other agents observing "thought we were observing somebody transferring narcotics to another vehicle" "based on the totality of the circumstances." *Id.*

After Esquivel talked to Santos in the truck, Pena and Esquivel got into the white Volkswagen, with Pena driving, and everyone left. *Id.* Rogers relayed this information to Harris County Sheriff's officers and requested that they engage in a traffic stop of the Volkswagen. *Id.*

Deputy Cecil Sweeney from the Harris County Sheriff's Department, who is assigned to Homeland Security as a task force officer and narcotics K-9 and has worked for the Sheriff's Department for twenty-two years, answered the call to engage the Volkswagen Passat in a traffic stop. *Id.* He was advised that there was an ongoing narcotics investigation by Agent Rogers of Homeland Security. *Id.* He pulled the vehicle over for going 65 in a 60-mph zone and failing to signal a lane change twice. *Id.* Sweeney did not have a bodycam or a dashcam that day. *Id.*

Sweeney came into contact with the driver, who was fumbling for his ID and insurance and would not make eye contact. *Id.* Sweeney asked the driver to exit the vehicle for officer safety. *Id.* Sweeney told the driver why he stopped him, and he sat the driver in the backseat of his unit and went back to the passenger side of the Volkswagen; Esquivel exited the vehicle before Sweeney got there. *Id.* Sweeney got Esquivel's identification and returned to his car to run the records checks. *Id.*

Sweeney asked for another unit after he spoke with the driver because "the driver was really nervous, and then the passenger [Esquivel] kept getting out on [him]. He didn't want to be in the car." *Id.* Other officers arrived, and Esquivel was put into another vehicle "for officer safety." *Id.* The driver of the vehicle gave Sweeney consent to search the car. *Id.* Sweeney deployed his dog at 10:57 p.m. *Id.*

### 2. Supplemental Arguments

Esquivel argues that the traffic stop on December 20, 2018, was impermissibly prolonged, that Esquivel has standing to challenge the prolonged stop, and that there was no reasonable suspicion of drug trafficking to justify the seizure. Dkt. 71.

The Government argues that it had reasonable suspicion for both traffic violations and narcotics trafficking when Pena's vehicle was stopped on December 20. Dkt. 72. It notes that Sweeney was dispatched at 10:49 p.m. and had consent to search the vehicle by 10:57 p.m. *Id.* Thus, it contends the stop, which lasted less than ten minutes before consent, was not prolonged. *Id.*

Esquivel contends that the Government has not shown that Sweeney ever even ran a records check. Dkt. 73. Esquivel asserts that the Government did not pursue the initial basis of the stop and impermissibly prolonged the alleged basis of the stop. *Id.* Esquivel contends there was no reasonable suspicion of narcotics trafficking. *Id.*

### C. December 26, 2018 Interview

#### 1. Testimony

Esquivel's probable cause and bail hearing was held on December 22, 2018 (Def. Ex. 6), and the judge appointed the public defender to assist Esquivel during the bail hearing. *Id.* On December 26, 2018, Rogers and other agents with HSI visited Esquivel and conducted an interview

14

of Esquivel at the Harris County Jail. *Id.* Rogers advised Esquivel that an attorney would be appointed for him the next day.[9] *Id.*; *see* Def. Ex. 9 at 55:40. Rogers testified that Esquivel read and signed a declaration of rights that was in Spanish, and he initialed each one. *Id.*; *see also* Gov't Ex. 4 (Spanish Dec. of Rights). He also testified that there was a Spanish translator "so [Esquivel] could understand what was going on, so we could make sure." Dkt. 63. Rogers agreed with defense counsel that he did not think Esquivel's "English was that good." *Id.* However, he noted on redirect that he did converse with Esquivel in English for about the first four minutes of the interview. *Id.*

There is a recording of the interview, and at some point, somebody (not Rogers) said when discussing the appointment of counsel "that's when in court." *Id.* Later, the Spanish speaking officer told Esquivel that he had a right to have an attorney there while they were talking to him. *Id.* Esquivel then said, "Yes, but, in what you just said that I need – that I can have an attorney here present if I can't pay for one. Does one have to be here or does he not have to be here?" *Id.*; Def. Ex. 10 (translation or interview).

### 2. Supplemental Arguments

Esquivel argues that the December 26, 2018 statements were obtained in violation of *Miranda* because the Government cannot show Esquivel knowingly waived his rights and they were obtained in violation of his Sixth Amendment right to counsel because Esquivel asked about having an attorney present and was told "that is going to be in court." Dkt. 71.

The Government contends that Esquivel's *Miranda* rights were reasonably conveyed to him prior to his waiving the rights. Dkt. 72. In fact, the Government states that Esquivel was told

---

[9] Counsel was indeed appointed on December 27, 2018. Def. Ex. 8.

three times that he had the right to remain silent and have attorneys present with him, once by a judge. *Id.* He also initialed each right on a written declaration of rights. *Id.* The Government argues that the addition by the agent that a lawyer would be for the court does not change the fact that Esquivel was informed of his rights clearly and plainly. *Id.*

Esquivel argues that the misstatement of *Miranda* is relevant, as the officer stated that if they were going to give Esquivel a lawyer "it will be for court only." Dkt. 73 (citing Def. Ex. 10 at 3). Esquivel contends there was no free, knowing, or voluntary waiver of the right to counsel because he was informed that his right to counsel was for court only. *Id.* Additionally, Esquivel notes that he argued in his original brief that when he invoked his right to counsel at the initial probable cause hearing and then an interview was conducted without counsel, it was in violation of his right to counsel. *Id.* Esquivel asserts that the Government did not respond to this argument and so Esquivel stands on his initial submission. *Id.*

## II. LEGAL STANDARD

Under the Fourth Amendment to the United States Constitution, the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "The 'basic purpose of this Amendment' . . . 'is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (citations omitted). "When an individual 'seeks to preserve something as private,' and his expectation of privacy is 'one that society is prepared to recognize as reasonable,' . . . official intrusion into that private sphere generally

qualifies as a search and requires a warrant supported by probable cause." *Id.* (quoting *Smith v. Maryland*, 442 U.S. 735, 740, 99 S. Ct. 2577 (2016)).

The rights discussed in *Miranda v. Arizona* relate to custodial interrogation and are contained in the Fifth Amendment to the United States Constitution, and the right to a lawyer to help with criminal prosecutions is in the Sixth Amendment to the United States Constitution. Under the Fifth Amendment, "no person . . . shall be compelled in any criminal case to be a witness against himself."   U.S. Const. amend. V.   In *Miranda*, the U.S. Supreme Court held that an individual in custody who is subject to questioning has a privilege against self-incrimination under the Fifth Amendment, and that "[p]rocedural safeguards must be employed to protect the privilege" including warning the suspect that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation." *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S. Ct. 1602 (1966).   Any waiver of these rights must be knowing and intelligent.   *Id.*

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."   U.S. Const. amend. VI.   This right is offense specific and does not attach until a prosecution is commenced.   *McNeil v. Wisconsin*, 501 U.S. 171, 175, 111 S. Ct. 2204 (1991).   The right attaches after the first formal charging proceeding.   *Moran v. Burbine*, 475 U.S. 412, 429, 106 S. Ct. 1135 (1986).   In the Texas state court system, the Sixth Amendment right "is triggered by judicial arraignment or Article 15.17 magistration." *Pecina v. State*, 361 S.W.3d 68, 71 (Tex. Ct. Crim. App. 2012).   "[T]he Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the

criminal proceedings," but it "may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent." *Montejo v. Louisiana*, 556 U.S. 778, 786, 129 S. Ct. 2079 (2009). "A defendant may waive the right whether or not he is already represented by counsel; the decision to waive need not itself be counseled," and "when a defendant is read his *Miranda* rights . . . and agrees to waive those rights, that typically does the trick, even though the *Miranda* rights purportedly have their source in the *Fifth* Amendment." *Id.*

### III.  Legal Analysis

The court will consider Esquivel's arguments with regard to each date *in seriatim*

### A.  May 17, 2018

Esquivel seeks to suppress any evidence obtained on May 17, 2018, including the money found in the car and statements made by Esquivel, because (1) the display of temporary tags is not a valid basis for a traffic stop; (2) the stop was impermissibly prolonged; (3) the Government cannot show Esquivel knowingly and voluntarily consented to the search of the vehicle; (4) Esquivel was "in custody" and not informed of his rights under *Miranda* before making custodial statements to task force officers.  Dkt. 71.

### 1.  Was the Basis for the Stop Permissible?

First, the court will consider the argument that there was no valid basis for the stop.  "The legality of a traffic stop is analyzed under the framework articulated in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005).  The court thus determines if there was reasonable suspicion for the stop by considering "whether the officer's action was: (1) 'justified at its inception'; and (2) 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *Id.* (quoting *Terry*, 392 U.S. at 19–20).  "For a traffic stop to be justified at its inception, an officer must have an

18

objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *Id.* The "reasonable suspicion" inquiry involves considering the "totality of the circumstances" to determine if the officer had a ""'"particularized and objective" basis for suspecting legal wrongdoing.'" *Id.* (quoting *United States v. Arvizu*, 534 U.S. 266, 274, 122 S. Ct. 744 (2002)). A "mere hunch will not suffice." *Id.*

Dedeaux credibly testified that the temporary tag was flailing while Esquivel was driving down the highway in Mississippi and could not be read while the car was in motion. Under Mississippi law, "No vehicle bearing a distinguishing number tag shall be operated upon the highway of [Mississippi] unless such tag is *conspicuously displayed* on the vehicle being operated in such a manner that it may be easily read. Such tags shall be kept reasonably clean and shall not be defaced in any manner." Miss. Code Ann. § 27-19-323 (emphasis added); *see Gonzales v. State*, 963 So.2d 1138, 1143 (¶ 20) (Miss. 2007) (noting that Miss. Code Ann. § 27-19-323 "provides that vehicles operated on Mississippi's highways must have tags 'conspicuously displayed on the vehicle being operated in such a manner that it may be easily read'" and, in light of this language, "it is not enough that the vehicle actually had a tag," and the fact that a tag was not conspicuously displayed and easily read meant an officer "was fully justified in making the stop"). If a tag is not fastened to prevent it from flapping in the wind as the vehicle progresses down the road, then it would not be conspicuously displayed in a way that could be easily read. Esquivel challenges the credibility of Dedeaux's testimony that he stopped Esquivel because the tag was flailing because (1) Dedeaux's report said he stopped Esquivel "to verify the temp tag and the purchase of vehicle" (Dkt. 63 (hearing transcript) at 51); (2) Winter's report said Esquivel was "stopped for displaying a Texas paper tag" or a "temporary tag" (citing Dkt. 63 at 103); (3) no ticket was issued; and (4) the police did not preserve the dash camera video evidence. Dkt. 71.

During the hearing, Dedeaux explained "once I stopped it, . . . I could tell it was a temp tag. When it passed me, I didn't know what state temp tag it was or what it was." Dkt. 63 at 52. He clarified that "I did stop the car because I couldn't tell. I wanted to verify and make sure it was a legit temp – temp tag, correct. . . . But . . . if I could have saw it, I would have ran the numbers and I wouldn't have had to pull it over. Period." *Id.* at 53. He noted that he "explained to [Esquivel] that he needed to go to the next exit and get tape and tape it down." *Id.* at 53–54. While Esquivel cites cases in which courts have not credited law enforcement testimony that differs from the written report or reports (*see* Dkt. 71 at 17–18 (providing case law and parentheticals)), here, the court does find that the reports actually differ in a relevant way. While the officers used a somewhat shorthand version of events in the reports—"to verify temp tag" or "stopped for displaying a temporary tag"—both officers explained that the temporary tags were a reason to stop in this case because they were not readable while flapping in the wind. Dedeaux explained that he has "stopped temp tags before for not being able to read them" and "[i]f the tags are obscured and I can't read it, I stop you for that. And if a paper tag is blowing in the wind and I can't read it, I am going to stop it." *Id.* at 55. The court found Dedeaux credible and finds that he stopped the car because the tag was not properly secured, making it difficult to read on the highway. Driving the car without having the tag conspicuously displayed so that it could be easily read is a violation of Mississippi law.

Esquivel further notes that the lack of a citation for the alleged violation undercuts the testimony about a violation, and the failure to preserve the dash camera evidence combined with not stating the tag was flapping in the wind in the reports and lack of citation constitute a failure of the government to meet its burden to establish a sufficient basis to support the traffic stop. Dkt. 71. Dedeaux explained that he requested the dash camera video as soon as the Government

20

requested it, but they only preserve video for approximately six months and they could not recover it.  Dkt. 63 at 58.  Federal charges were not brought in this case until almost two years after this stop.  As far as not issuing a ticket, Dedeaux testified that he did not intend to issue a ticket when he stopped Esquivel.  *Id.* at 82.  Instead, he "explained to him that he needed to go to the next exit and get tape and tape it down."  *Id.* at 53–54.  The court found the testimony as to why there was no citation and why the dash camera evidence was unavailable credible.

Esquivel's motion to suppress based on an invalid reason for the traffic stop is DENIED.

### 2.      Was the Stop Impermissibly Prolonged?

The court now turns to the argument that Dedeaux impermissibly prolonged the traffic stop.  Under the second prong of *Terry*, an officer cannot detain the person stopped "longer than necessary to effectuate the purpose of the stop."  *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004); *see Rodriguez v. United States*, 575 U.S. 348, 350, 135 S. Ct. 1609 (2015) ("We hold that a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures.").  The officer "may permissibly examine the driver's license and registration and run a computer check on them to investigate whether the driver has any outstanding warrants and if the vehicle is stolen."  *Lopez-Moreno*, 420 F.3d at 430.  The officer may ask the driver "wide-ranging" questions unrelated to the purpose of the stop, but "once all relevant computer checks have come back clean, there is no more reasonable suspicion, and, as a general matter, continued questioning thereafter unconstitutionally prolongs the detention."  *Id.*  However, "if additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new suspicion has been dispelled or confirmed."  *Id.* at 431.

21

Esquivel contends that when Dedeaux asked Esquivel to exit his vehicle to speak with him and to consent to searching the car, he had already confirmed the vehicle was not stolen, the tags were valid, and Esquivel did not have any warrants. Dkt. 71. Thus, Esquivel contends that the time needed to handle the stop had expired, and Dedeaux impermissibly prolonged the stop. *Id.* Esquivel contends that the prolongation is not supported by reasonable suspicion, as even though Esquivel was nervous and driving a vehicle that belonged to a friend of a friend, that does not rise to reasonable suspicion that crime was afoot. *Id.* (citing cases).

The Government, on the other hand, asserts that Esquivel was nervous, provided documentation for the incorrect vehicle at first, failed to explain the discrepancy between the name on the paperwork and the person he said owned the car, and had no luggage in the car despite saying he was traveling from Atlanta to see his father, and, moreover, the government database checks indicated Esquivel was suspected for involvement in narcotics crimes. Dkt. 72. The Government contends that these facts amount to additional reasonable suspicion arising during the course of the stop before the initial purpose of the stop was fulfilled. *Id.*

Esquivel primarily relies on *State v. Wilson*, *United States v. Tapia*, and *United States v. Monsivais*. Dkt. 71. The Government relies on *United States v. Lopez-Moreno* and *United States v. Rodriguez*. Dk. 72. These cases are relevant to this stop and to the stop Esquivel challenges in December 2018. In *Rodriguez*, a police officer pulled over a vehicle after the officer observed the vehicle veer onto the shoulder of the road, which was a valid reason for a traffic stop. 575 U.S. at 351. The officer was a K-9 officer. *Id.* There was a driver and a front-seat passenger in the car the officer pulled over. *Id.* The officer advised the driver of the reason for the stop, gathered his driver's license, registration, and proof of insurance, and asked the driver to accompany him to the patrol car. *Id.* The driver asked if he was required to go to the patrol car, and the officer said no,

so the driver waited in his own vehicle.  *Id.*  The officer ran a records check, returned to the vehicle, asked the passenger for his license, and questioned the passenger about where they were coming from and where they were going.  *Id.*  The officer returned to his patrol car, completed a records check on the passenger, and called for a second officer.  *Id.*  The officer also started writing a warning ticket to the driver for driving on the shoulder.  *Id.*

The officer returned to the stopped car a third time with the warning, explained it to the driver, gave it to the driver, and returned documents to the driver and passenger.  *Id.* at 352.  The officer, however, did not consider the driver "free to leave" at that point, and asked permission to walk his dog around the vehicle even though the justification for the traffic stop was "out of the way."  *Id.*  The driver said no.  *Id.*  The officer then told the driver to exit the vehicle and stand in front of the patrol car.  *Id.*  A deputy sheriff then arrived, and the first officer had his dog walk around the vehicle two times.  *Id.*  The dog alerted to the presence of drugs.  *Id.*  There had been seven to eight minutes from the time the written warning was issued and the dog alerted to the drugs.  *Id.*  A search of the vehicle revealed a large bag of methamphetamine.  *Id.*  The driver was indicted on drug charges and moved to suppress the evidence.  *Id.*  The trial court denied the motion to suppress because the extension of time for the dog sniff was *de minimis*.  *Id.* at 353.  The Eighth Circuit affirmed.  *Id.*  The U.S. Supreme Court reversed, holding that "[a]uthority for the seizure ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 354.  It did not matter that the amount of time was *de minimis*.  The Court remanded the case to the Eighth Circuit to determine "whether reasonable suspicion for criminal activity justified detaining [the driver] after completion of the traffic infraction investigation."  *Id.* at 358.

In *Lopez-Moreno*, the defendant was originally stopped because neither of the side brake lights on the passenger van he was driving was functioning.  420 F.3d at 425.  The officer believed

this was a violation of a Louisiana statute. *Id.* The van was owned by a company that provides transportation within the United States to destinations in Mexico. *Id.* The driver of the van, Lopez-Moreno, was a Mexican citizen and lawful permanent resident of the United States and had left Houston that morning with nine passengers. *Id.* The officer requested Lopez-Moreno's license, explained the problem with the brake lights, and asked Lopez-Moreno about where he was going, how many passengers he had and their immigration statuses, and who he worked for. *Id.* When asked if the passengers were legally in the United States, Lopez-Moreno responded, "I guess, I don't know . . . I just work for the company." *Id.* at 426. Lopez-Moreno allegedly agreed when the officer stated that some of the passengers probably were not legal. *Id.*

The officer went to his police car, requested a backup officer, and called in Lopez-Moreno's driver's license to run a check for warrants. *Id.* He returned to the van and *again* asked Lopez-Moreno about the immigration status of his passengers; when the officer stated that "none of them are legal," Lopez-Moreno allegedly shrugged. *Id.* Lopez-Moreno volunteered to get the passenger manifest from the back of the van, and while he was doing that, the dispatcher called and said there were no outstanding warrants. *Id.*

While the officer and Lopez-Moreno were going over the passenger list, the backup officer arrived. *Id.* The first officer called an agent with the United States Bureau of Immigration and Customs Enforcement ("ICE"), who talked to Lopez-Moreno on the phone and asked questions about the passengers' immigration status that Lopez-Moreno could not answer. *Id.* at 427. The ICE agent told the original officer to detain Lopez-Moreno and the passengers until he could get there; he was thirty minutes away. *Id.* When the ICE agent got there, he interviewed Lopez-Moreno and the passengers, and he suspected the passengers were not legally in the United States. *Id.* He arrested Lopez-Moreno for suspicion of transporting undocumented aliens. *Id.* The

24

original officer who stopped Lopez-Moreno issued a ticket for failing to comply with the brake light statute and failing to have a vehicle registration slip.  *Id.*  They also detained the passengers on suspicion of being in the United States illegally.  *Id.*

Lopez-Moreno was indicted for transporting undocumented aliens and conspiracy.  *Id.* Lopez-Moreno filed a motion to suppress the evidence based, in part, on the argument that the stop was improperly prolonged because the officer had no reasonable suspicion that the passengers were undocumented aliens and should have released them after the warrant check on Lopez-Moreno came back clean.  *Id.* at 433.  The Government argued that the stopping officer had reasonable suspicion to continue to detain Lopez-Moreno after the check was clean because (1) there had been several traffic stops in the area that led to the detention of vans of undocumented aliens, including one in which this officer had participated in; (2) Lopez-Moreno did not know the names of the passengers; (3) Lopez-Moreno answered "might" when asked if his passengers were in the United States illegally; and (4) Lopez-Moreno shrugged when asked the same questions, which the officer took as either agreement or evasion.  *Id.*  The trial court had denied the motion to suppress, and the Fifth Circuit noted that its review must take into account whether, considering the totality of circumstances, "a reasonable person would suspect that Lopez-Moreno was engaging in illegal activity."  *Id.*  The court noted that any of the factors the Government espoused as contributing to reasonable suspicion would not rise to that level on its own, but, when "viewed in conjunction," it found there was reasonable suspicion.  *Id.*

In *State v. Wilson*, which is a Montana Supreme Court case relied upon by Esquivel, a Montana highway patrolman ran the tags of a Chrysler LX after the occupants immediately looked away from him, and he found that the registration had expired.  430 P.3d 77, 79 (Mont. 2018) (hereinafter "*Johnathan Samuel Wilson*").  The officer thus stopped the vehicle.  *Id.*  He advised

the driver about the expired registration, and the driver seemed surprised. *Id.* He was trembling, and the passenger was avoiding eye contact with the officer. *Id.* The officer noticed the vehicle had a "rental sticker" in the rear passenger window that the officer thought was "really weird," there was a suitcase in the back seat, and the vehicle had a "lived in appearance." *Id.* at 79–80. The driver could not find his wallet and told the officer he must have left it at the gas station. *Id.* at 80. The officer asked the driver to step out of the vehicle and told him to sit in the front seat of the patrol car. The driver said they were traveling to North Dakota after the driver's wedding in Idaho, and the officer thought it was strange that the driver was traveling without his new wife. *Id.* at 80. The driver told the officer that his wife needed to travel separately with their kids to set up the wedding early and that he was borrowing the car from a work acquaintance. *Id.* When the officer ran the driver's license, he had a valid license with several driving infractions. *Id.* The officer returned to the stopped vehicle to question the passenger, and the passenger corroborated the driver's story. *Id.*

When the record check came back, it revealed that the driver had a history of prior drug charges.[10] *Id.* The officer called for a border patrol agent and K-9 handler to bring his dog. *Id.* Three minutes later, the officer issued citations for failure to provide proof of insurance and for operating a vehicle with an expired registration. *Id.* The driver asked the officer if he was "good to go" and the officer said yes. *Id.* He then, however, requested that the driver stay for further questioning. *Id.* He advised the driver that the highway they were on was a drug trafficking corridor and asked if there were drugs in the vehicle. *Id.* The driver denied that there were drugs. *Id.* The officer asked if he could search the vehicle and the driver said no. *Id.* He asked if the

---

[10] The driver had been on probation two years ago for marijuana. 430 P.3d at 241 (¶ 10).

driver would wait for the drug K-9, and the driver said he would prefer not to wait.  *Id.*  The officer then told the driver that a canine search was going to take place and that he needed to wait for the K-9.  *Id.*

A border patrol agent with a K-9 arrived about 45 minutes after the initial stop.  *Id.*  The dog detected drugs in the car, and the border patrol agent advised that they would be applying for a warrant to search the vehicle.  *Id.* at 81.  They searched the car when the warrant came back and found a small bag of marijuana, a pipe, and a large bag containing two bags of marijuana in the trunk for a total of 262.2 grams of marijuana.  *Id.*  The driver and passenger were arrested, and the driver was indicted on drug charges.  *Id.*  He moved to suppress, and the trial court denied the motion, finding that the officer had enough facts to expand the traffic stop and had "particularized suspicion" to justify a canine search of the vehicle's exterior.  *Id.*  Particularized suspicion is the standard for a canine search under the Montana Constitution.  *Id.*  "Particularized suspicion is objective data from which an experienced police officer can make certain inferences and a resulting suspicion that the occupant of the vehicle is or has been engaged in wrongdoing."  *Id.*  It, like reasonable suspicion, is determined from the totality of the circumstances.  *Id.*

The Supreme Court of Montana determined that the totality of circumstances did not rise to particularized suspicion, noting that one of the espoused reasons for the suspicion was the bizarre travel plans, which the court did not find particularly bizarre and which were corroborated by the passenger when questioned separately.  *Id.* at 83.  Without discussing the past history of a drug crime, the court found that the "indicators" relied upon by the officer for the canine search "reveal[ed] only a generalized hunch and not an articulation of specific facts demonstrating criminal behavior."  *Id.*  It noted that the factors "were not objectively indicative of illegal drug

activity." *Id.* The court held that the stop should have ended with the citation and the driver and passenger were kept there waiting for the canine without particularized suspicion. *Id.*

In a subsequent Supreme Court of Montana case (unpublished), the court found particularized suspicion in similar circumstances. A state trooper had stopped a driver for speeding in a construction zone, noticed that the interior of the car looked like the driver was driving for long periods without stopping and that the vehicle smelled strongly of cigarette smoke, which is often used to mask the smell of contraband, and the driver had recent marijuana trafficking charges out of Kentucky. *State v. Wilson*, No. DA 18-0247, 2020 WL 4783210, at *4 (Mont. Aug. 18, 2020) (unpublished) (hereinafter "*Michael David Wilson*"). The court found that particularized suspicion for the canine sniff arose from the officer's observations of the condition of the rental vehicle, the fact that the background check revealed recent drug charges, and responses to routine questioning. *Id.* The main differences in this case and *Johnathan Samuel Wilson* are that the drug charges were more recent in *Michael David Wilson* and that the court thought the officer incorrectly relied on the suspicious wedding travel plans in *Johnathan Samuel Wilson*. These two cases demonstrate that there is a fine line, at least in Montana, between a hunch and reasonable or particularized suspicion.

In *United States v. Tapia*, the Eleventh Circuit found that the following factors did not provide reasonable suspicion to prolong a stop involving two brothers: "being Mexican, having few pieces of luggage, being visibly nervous or shaken during a confrontation with a state trooper, or traveling on the interstate with Texas license plates (not yet a crime in Alabama)." 912 F.2d 1367, 1371 (11th Cir. 1990). The other "suspicious facts" urged by the Government were that the driver looked away quickly as he passed the officer, the brothers possessed valid Texas drivers' licenses, and the car was insured by a third party. *Id.* The passenger had advised the officer that

28

the vehicle belonged to his brother-in-law and that he and his brother were driving to Atlanta to find work. *Id.* at 1369. Ultimately, the Eleventh Circuit found that the marijuana that was found in the gas tank of the vehicle after two canine units were summoned should be suppressed. *Id.* at 1371. While there are some similarities between *Tapia* and the case at hand, including that a third party owned the car, stating that the car belongs to one's brother-in-law, as in the *Tapia* case, and not knowing the name of the person who owns the car, like the driver in the instant case, are completely different. Moreover, unlike the instant case, there was no drug flag on the reports the officer ran in *Tapia*.

In *United States v. Monsivais*, the Fifth Circuit considered a case in which the district court held, after a hearing on a motion to suppress, that a consensual encounter with a stranded motorist "'was transformed into a lawful *Terry* frisk due to the Defendant's demeanor, remarks, and for officer-safety reasons.'" 848 F.3d 353, 356 (5th Cir. 2017) (quoting the district court). The frisk resulted in recovering a firearm, which the defendant unlawfully possessed. *Id.* at 356–57. The Fifth Circuit found that the district court erred in failing to exclude the evidence because "the officers lacked a basis to reasonably suspect [the defendant] of a criminal act before seizing him." *Id.* at 357. It noted that reasonable suspicion must be more than a "mere hunch" but does not have to rise to "probable cause." *Id.* "An 'officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' an intrusion into the privacy of the detained individual." *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868 (1968)).

In *Monsivais*, the officer testified that he did not suspect the defendant of a criminal act when he began to question him or when he told him he was going to pat him down. *Id.* He just thought the defendant was "acting suspicious." *Id.* The Government argued that there was

29

reasonable suspicion, however, because (1) the defendant was jittery and kept putting his hands in his pockets; (2) the defendant was confused about where he had been and made inconsistent statements; and (3) the defendant walked past and away from the squad car after the officers stopped and turned on their lights. *Id.* at 358–59. The Fifth Circuit noted that nervous, evasive behavior is a relevant factor in determining reasonable suspicion, but here there was no evidence of evasion. *Id.* at 359. Nervousness alone is insufficient. *Id.* The court pointed out, in fact, that "[n]ervousness is an 'entirely natural reaction to police presence.'" *Id.* (quoting *United States v. McKoy*, 428 F.3d 38, 40 (1st Cir. 2005)). It thus gave little weight to the defendant being nervous, and it likewise determined that the placing of hands in the pockets "deserve[d] equally little weight." *Id.* The court also found that the defendant's statements to the officers were not necessarily inconsistent, and the fact that he walked away from the vehicle did not rise to reasonable suspicion because "the Constitution does not command individuals to enthusiastically greet law enforcement officers under such circumstances." *Id.* It noted that context is important, and found that, in this particular case, the context did not support reasonable suspicion. *Id.* In the instant case, however, Dedeaux's suspicion arose from more than nervousness.

*Rodriguez* teaches, in the context of the instant case, that Dedeaux's authority to detain Esquivel ended when the records checks came back and he made his decision not to ticket Esquivel for the violation unless he had otherwise developed reasonable suspicion for criminal activity while completing the tasks associated with the traffic infraction. *Lopez-Moreno* adds that the court must determine, considering the totality of circumstances, whether a reasonable person would have suspected that Esquivel was engaging in illegal activity. The Montana cases provide insight into how close the line between hunch and reasonable suspicion can sometimes be and inform the court that it must consider that distinction, and *Tapia* is demonstrative of a case in which there was not

30

enough information for a reasonable person to expect drug trafficking.  Finally, *Monsivais* shows that being nervous around police officers cannot transform a hunch into reasonable suspicion.

Here, Dedeaux relied on much more than the fact that Esquivel appeared nervous.  Esquivel was nervous, gave him the wrong papers at first, and did not know the name of the person who owned the car.  His story about traveling to visit his dad did not seem to match with the circumstances, he was traveling on a drug-trafficking corridor in a borrowed car, and his records check revealed that he had a history with drugs.  These circumstances are sufficient for a reasonable person to conclude that another crime was afoot.  *See United States v. Villafranco-Elizondo*, 897 F.3d 635, 642 (5th Cir. 2018) (The officer "had already developed reasonable suspicion that another crime was afoot.  Where an officer develops reasonable suspicion of another crime . . . during the course of a traffic stop, he may prolong the suspect's detention until he has dispelled that newly-formed suspicion.").  The court finds that Dedeaux had reasonable suspicion to prolong the stop.  Esquivel's motion to suppress evidence based on a prolonged stop is DENIED.

### 3. Was the Consent Voluntary?

The court now considers whether Esquivel's consent to search the vehicle during the Mississippi stop was voluntary.  A search pursuant to consent is "one of the well-settled exceptions to the Fourth Amendment warrant requirement."  *United States v. Tompkins*, 130 F.3d 117, 121 (5th Cir. 1997); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S. Ct. 2041 (1973).  When the government asserts that it had consent for a search, it "has the burden of proving that consent was, in fact, freely and voluntarily given."  *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S. Ct. 1788 (1968).  Whether consent is voluntary must be determined from the totality of circumstances.  *Schneckloth*, 412 U.S. at 227.  Courts in the Fifth Circuit consider the following six factors when considering the totality of circumstances:

> the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*United States v. Jenkins*, 46 F.3d 447, 451 (5th Cir. 1995).  All of these factors are "highly relevant," and "no one of the six factors is dispositive or controlling of the voluntariness issue." *Id.* (citations and quotations omitted).  A language barrier may impact the fourth and fifth prongs. *United States v. Lopez*, 817 F. Supp. 2d 918, 929 (S.D. Miss. 2011).

Since the Fourth Amendment specifically prohibits unreasonable searches and seizures, the "touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S. Ct. 1801 (1991).  Consensual searches are permissible because "it is no doubt reasonable for the police to conduct a search once they have been permitted to do so." *Id.* at 250–51.  The scope of that consent is likewise measured under a reasonableness standard—"what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Id.* at 251.  The scope is "'not to be determined on the basis of the subjective intentions of the consenting party or the subjective interpretation of the searching officer.'"  *United States v. Mendoza-Gonzalez*, 318 F.3d 663, 667 (5th Cir. 2003) (quoting Wayne R. LaFave, Search and Seizure § 8.1 (3d ed. 1996 & Supp. 2003)).

Consent may be "limited, qualified or withdrawn" by the person who originally consented. *Mason v. Pulliam*, 557 F.2d 426, 428 (5th Cir. 1977).  A "failure to object to the breadth of a search is properly considered 'an indication that the search was within the scope of the initial consent.'" *United States v. McSween*, 53 F.3d 684, 688 (5th Cir. 1995) (quoting *United States v. Cannon*, 29 F.3d 472, 477 (9th Cir. 1994)); *see United States v. Mendez*, 431 F.3d 420, 427 (5th Cir. 2005) ("It

is the defendant's responsibility to limit the scope of the search if he so intends."); *see also United States v. Thurman*, 889 F.3d 356, 367 (7th Cir. 2018) ("It is well established that a criminal suspect may limit the scope of consent to a search . . . but the burden is on him to do so." (citations omitted)).  If a defendant fails to limit the scope of a search, "the question that remains in determining its validity is whether, under the totality of the circumstances, the search was reasonable." *Mendez*, 431 F.3d at 427.

Here, Dedeaux claims that Esquivel consented to the search of the vehicle.  Esquivel argues that the only proof of a knowing and voluntary consent is a consent form that was likely in English and not preserved.  Dkt. 71.  However, this is not the *only* proof, as Dedeaux credibly testified that Esquivel knowingly and voluntarily consented to the search after signing a consent form.  *See* Dkt. 63.  Dedeaux testified that Esquivel said he understood the consent form and that he consented to the search.  *Id.*  Dedeaux testified that the consent form advised that the consenting person has the right to withdraw that consent at any time.  *Id.*  Esquivel argues that the consent form was in English and that the court should not rely on the form since the Government no longer has that evidence.  Dkt. 71.

The court must consider the totality of the circumstances and the factors set forth by the Fifth Circuit to determine whether consent to search the vehicle was knowingly and voluntarily given.  The court notes that there is no evidence that Esquivel did not feel free to leave or that Dedeaux was coercive prior to Esquivel giving consent; the testimony indicates that Esquivel was nervous but cooperative.  The court found Dedeaux's testimony that Esquivel read, or at least appeared to read, the consent form, and communicated well in English credible.  There is no evidence in the record about the defendant's education or intelligence, and the testimony about his language abilities indicates that he can communicate well in English.  Dkt. 63.  There was also

33

testimony indicating that the defendant did not believe there was incriminating evidence in the car—Dedeaux testified that Esquivel said he did not know anything about the money being in the car after Dedeaux told him about it.  *See id.*  The court finds, considering the totality of the circumstances and the fact that Dedeaux's testimony was credible, that Esquivel knowingly and voluntarily consented to the search of the vehicle.  Accordingly, Esquivel's motion to suppress the evidence found during the roadside search for lack of consent is DENIED.

### 4.        Was Esquivel In Custody?

The court turns now to the question of whether Esquivel's statements made at the police station should be suppressed.  The Government bears the burden of proving, by a preponderance of the evidence, that the statements made during an interrogation were voluntary.  *United States v. Rojas–Martinez*, 968 F.2d 415, 417–18 (5th Cir.1992) (citing *Colorado v. Connelly*, 479 U.S. 157, 168–69, 107 S. Ct. 515 (1986)).  The voluntariness of a defendant's statement is reviewed based on the totality of the circumstances surrounding the interrogation.  *Dickerson v. United States*, 530 U.S. 428, 437, 120 S. Ct. 2326 (2000); *United States v. Cardenas*, 410 F.3d 287, 293 (5th Cir.2005).  When reviewing the totality of the circumstances, both the characteristics of the accused and details of the interrogation should be considered.  *Dickerson*, 530 U.S. at 434.

"Custodial interrogation" occurs when questioning is "initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way."  *United States v. Chavira*, 614 F.3d 127, 132 (5th Cir. 2010).  "The ultimate inquiry is whether there is a formal arrest or restraint on freedom of movement of a degree associated with formal arrest."  *Id.* at 133; *see United States v. Ortiz*, 781 F.3d 221, 229 (5th Cir. 2015) ("[C]ustody arises only if restraint on freedom is a certain degree—the degree associated with formal arrest.").  Courts must consider "how the reasonable man in the suspect's position

would have understood the situation." *Chavira*, 614 F.3d at 132. "The subjective intent of neither the officer nor the defendant is relevant to the custody determination." *Id.* Thus, "'[t]wo discrete inquiries are essential to the determination [of whether a suspect is in custody]: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave.'" *United States v. Wright*, 777 F.3d 769, 774 (5th Cir. 2015) (quoting *United States v. Cavazos*, 668 F.3d 190, 193 (5th Cir. 2012)).

In *United States v. Broca-Martinez*, 162 F. Supp. 3d 565, 569–70 (S.D. Tex. 2016), Judge Ellison considered a case in which the defendant was placed in the back of a police car during a traffic stop. The court noted that the defendant "was never handcuffed, nor was he physically restrained in any way" and that "[w]hether the suspect was placed in physical restraints is a factor that has been given particular importance in cases where, as here, the suspect was held in the back of a police car." 162 F. Supp. 3d at 570 (collecting cases). While the court found that the defendant's "freedom had been curtailed to a significant degree," "the degree of restraint 'which the law associates with formal arrest' is very high indeed." *Id.* at 570–71. After considering the totality of circumstances, Judge Ellison decided that the defendant was not "in custody" for *Miranda* purposes. *Id.* at 571.

The Fifth Circuit recently considered a similar question that did involve a handcuffed defendant in a habeas case in which the defendant asserted that the police had violated *Miranda* and that his state court conviction under the Antiterrorism and Effective Death Penalty Act should be overturned. *Dolph v. Davis*, 765 F. App'x 986 (5th Cir. 2019) (unpublished), *cert denied* 140 S. Ct. 248, 205 L. Ed. 2d 142 (2019). The court noted that in determining whether a reasonable person would feel he or she is in custody, courts consider circumstances including "'the location

of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning.'" *Id.* at 990 (quoting *Howes v. Fields*, 565 U.S. 499, 509, 132 S. Ct. 1181 (2012)). It pointed out that under U.S. Supreme Court precedent, restraining an individual's freedom of movement is "'only a necessary and not a sufficient condition for *Miranda* custody.'" *Id.* (quoting *Fields*, 565 U.S. at 509). The Fifth Circuit held that the defendant in the *Dolph v. Davis* case was not "in custody" for *Miranda* purposes because (1) he was not questioned in private or in isolation; (2) he did not experience threats or a police dominated atmosphere; and (3) he was questioned only briefly during the stop and specifically told he was not under arrest. *Id.* The defendant was handcuffed, which the court noted "obviously cuts the other way," but it noted that there was "no clearly established law that *Miranda* warnings must be given whenever an individual is handcuffed."[11] *Id.*

Here, the court must consider the circumstances and whether a reasonable person in Esquivel's situation would have believed he was in custody. Esquivel, like the defendant in *Broca-Martinez*, was placed in the back of a police car. According to Dedeaux, the door was unlocked when he was conducting the search of the Passat. Esquivel, unlike the defendant in *Broca-Martinez*, was also placed in handcuffs. Esquivel was then taken to the police station in the police car. His handcuffs were removed once they arrived at the police station, but he was taken to a

---

[11] The Fifth Circuit acknowledged that the Second Circuit has held otherwise in a case involving a direct appeal. *Dolph*, 765 F. App'x at 991 n.4. In that case, the Second Circuit held that handcuffing a parolee while his house was being searched "restrained him to a degree associated with formal arrest." *United States v. Newton*, 369 F.3d 659, 673 (2d Cir. 2004). However, in the *Dolph* case, the Fifth Circuit found that the state court "could have reasonably side[d] with the numerous other courts that have held otherwise in a (lopsided) split." *Dolph*, 765 F. App'x at 991 n.4.

small room at a police station, where he was asked questions. Somebody else drove his vehicle to the police station. While officers testified that they told Esquivel that he was free to go, he did not have access to his vehicle until after Dedeaux completed the search. The court notes that Esquivel did decide to terminate discussion during his interview and was released at the end of the questioning. However, taking into account the totality of the circumstances, the court finds that a reasonable person in Esquivel's situation would believe he or she was in custody from the time the handcuffs were placed on Esquivel until the questioning in the small room at the police station ceased and his keys were returned. Since the Government does not argue that anybody informed Esquivel of his rights under *Miranda*, any responses Esquivel gave during this custodial interrogation should be suppressed. Esquivel's motion to suppress the statements and any fruits from those statements is GRANTED.

**B.      December 20, 2018 Stop**

Esquivel argues that the stop on December 20, 2018, was impermissibly prolonged under *Rodriguez* and there was no reasonable suspicion or probable cause to justify seizure of Esquivel for drug trafficking. Dkt. 71. The Government contends that there is no question that law enforcement had reasonable suspicion to stop the vehicle in which Esquivel was a passenger for suspicion of narcotics trafficking in addition to traffic violations and points out that it took less than ten minutes from the stop to the time the driver gave consent to search, which it argues indicates the stop was not unreasonably prolonged. Dkt. 72. In reply, Esquivel notes that even though there was evidence of a hidden compartment, there was no knowledge that Santos was transporting drugs, and the fact that Pena grabbed something from Santos's vehicle and Esquivel later sat in the vehicle and had a conversation with Santos in a busy shopping center five days before Christmas does not rise to reasonable suspicion for a drug seizure. Dkt. 73. He asserts that

the Government's contention that Santos was driving from Brownsville to Houston, which is a drug trafficking corridor, should have little weight since people travel from Brownsville to Houston every day who are not associated with the drug trade. *Id.*

The court finds that the evidence that there was knowledge of a hidden compartment in the vehicle and that Santos then drove from Brownsville to Houston, a known drug trafficking corridor, met with two individuals in a shopping center parking lot, and Esquivel and Pena received or took some sort of package from Santos, is enough for the officers to have reasonable suspicion that Esquivel and Pena were engaged in drug trafficking. The court agrees that it was five days until Christmas, and certainly Santos could have been bringing a non-drug-related Christmas gift from Brownsville to friends, but the Government does not have to show beyond all doubt that it was a drug deal. The fact that Santos had a secret compartment and that the exchange occurred in a parking lot and not around a Christmas tree lends significant credibility to the officers' determination that this was a drug transaction. Considering the totality of the circumstances, there was reasonable suspicion to stop the car outside of the traffic violations. Therefore, to the extent the stop could possibly be considered "prolonged" for the traffic violation, it was not prolonged because it was necessary to investigate the reasonable suspicion that Esquivel and Pena had just engaged in a drug deal. Esquivel's motion to suppress based on a prolonged stop on December 20 is DENIED.

## C.    December 26 Interview

Esquivel argues that the Government must show that he freely, knowingly, and voluntarily waived his *Miranda* rights when they conducted a two-hour custodial interview of him at the Harris County jail. Dkt. 71. The Government contends that this is a "euphemism" that is "generally acceptable as hallway chatter" but it is "not the legal standard." Dkt. 72. In explanation, the

38

Government notes that instead the rights must be "reasonably" conveyed to the defendant, arguing that the "law does not require that the rights articulated in *Miranda* be repeated verbatim like an incantation or some form of mystical witchcraft." *Id.* Esquivel additionally asserts that he invoked his right to counsel when he requested the appointment of the public defender at his probable cause hearing and then further requested the appointment of counsel, and, given the improper advisement of the officer during the custodial interview that the lawyer who was appointed was for court and that adversary proceedings had already been initiated, he never validly waived his right to counsel that he had previously invoked. Dkt. 71. The Government argues that Esquivel knew he had a right to remain silent and the right to an attorney, and it "is not the job of federal agents to provide suspects and defendant with legal counsel, indeed it would be both a moral and constitutional hazard to ask for such a proposition." Dkt. 72.

In *Miranda v. Arizona*, the U.S. Supreme Court held that "police officers must warn a suspect [in custody] prior to questioning that he has a right to remain silent, and a right to the presence of an attorney." *Maryland v. Shatzer*, 559 U.S. 98, 103–04, 130 S. Ct. 1213 (2010) (citing *Miranda*, 384 U.S. at 444). "The Government must administer *Miranda* warnings before custodial interrogations." *Chavira*, 614 F.3d at 132. Officers must cease questioning if the suspect invokes the right to remain silent or the right to an attorney. *Shatzer*, 559 U.S. at 104. A suspect may waive these rights, but the Government "must show that the waiver was knowing, intelligent, and voluntary under the 'high standar[d] of proof for the waiver of constitutional rights [set forth in] *Johnson v. Zerbst*, 304 U.S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938).'" *Id.* (quoting *Miranda*, 5384 U.S. at 475).

The "'rigidity' of *Miranda*," however, does not extend "to the precise formulation of the warnings given a criminal defendant." *California v. Prysock*, 453 U.S. 355, 359, 101 S. Ct. 2806

39

(1981). There is no requirement of a "verbatim recital of the words of the *Miranda* opinion." *Id.* However, linking the appointment of counsel "to a future point in time after police interrogation" does not "fully advise he suspect of his right to appointed counsel before such interrogation." *Id.* at 360. But, advising a defendant that counsel will be appointed "if and when you go to court" does not render the *Miranda* warning inadequate so long as the suspect knows he has a right to counsel before answering questions and that he can stop answering at any time so that he can talk to a lawyer first.[12] *Duckworth v. Eagan*, 492 U.S. 195, 200–01, 204–05, 109 S. Ct. 2875 (1989). The standard is simply whether the warnings given "reasonably convey to a suspect his rights as required by *Miranda*." *Id.* at 203 (citations, quotation, alterations omitted). "The addition of an erroneous statement does not vitiate an otherwise correct *Miranda* warning" if "the warning reasonably convey[ed]" the suspect's rights. *United States v. Harrell*, 894 F.2d 120, 125 (5th Cir. 1990).

Under *Edwards v. Arizona*, additional safeguards are necessary if a suspect requested counsel at a previous custodial interrogation. *Id.* Specifically, the accused himself must be the one to have initiated the further interrogation. *Id.* (relying on *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S. Ct. 1880 (1981)). Thus, "a voluntary *Miranda* waiver is sufficient at the time of an initial attempted interrogation to protect a suspect's right to have counsel present, but it is not sufficient at the time of subsequent attempts if the suspect initially requested presence of counsel [during a custodial interrogation]." *Id.* at 105. The purpose of the *Edwards* rule is to prevent a

---

[12] The Court in *Duckworth* distinguished the prohibition on linking the appointment of counsel to a future point in time discussed in *Prysock* because "the vice referred to in *Prysock* was that such warnings would not apprise the accused of his right to have an attorney present if he chose to answer questions." 492 U.S. at 205. The court found that the initial warnings in *Duckworth* "in their totality" satisfied *Miranda*. *Id.*

suspect from being "coerced or badgered into abandoning his earlier refusal to be questioned without counsel." *Id.* at 106. If there has been a break in custody of at least 14 days, which "is of sufficient duration to dissipate its coercive effects," then the rule no longer applies. *Id.* at 109–11. Additionally, *Edwards* applies only to the invocation of counsel for custodial interrogation. If the "court appoints counsel for an indigent defendant in the absence of any request on his part, there is no basis for a presumption that any subsequent waiver of the right to counsel will be involuntary." *Montejo v. Louisiana*, 556 U.S. 778, 789, 129 S. Ct. 2079 (2009). A defendant cannot invoke his *Miranda* rights "in a context other than 'custodial interrogation.'" *Id.* at 797 (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 182, 111 S. Ct. 2204 (1991)). "What matters for *Miranda* and *Edwards* is what happens when a defendant is approached for interrogation, and (if he consents) what happens during the interrogation—not what happened at any preliminary hearing." *Id.* The *Edwards* rule "requires, at a minimum, some statement that can reasonably be construed as an expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by police*. Requesting the assistance of an attorney at a bail hearing does not bear that construction." *McNeil*, 501 U.S. at 178.

During the hearing, Esquivel's counsel presented Defense Exhibit 6, which Esquivel argues is evidence that he requested counsel at his probable cause hearing on December 22, 2018. Dkt. 68-4, Ex. 6. The document actually states that Esquivel consented to allowing the public defender to represent him "at this bail hearing, knowing that this lawyer will not continue to represent you when this hearing is over," and that he requested "appointment of counsel to represent [him] in the county or district court" if he were deemed to be indigent. *Id.* It then ordered pretrial services to help the defendant prepare the necessary paperwork to request counsel. *Id.*

41

Four days later, on December 26, agents visited Esquivel in jail for the purpose of interviewing him. Dkt. 68-4, Ex. 7. Counsel was appointed for Esquivel on December 27, 2018. Dkt. 68-4, Ex. 8. During the visit on December 26, a Spanish speaking agent attended to translate. Dkt. 63. When Esquivel was reading the waiver of *Miranda* rights, which was provided in Spanish, he asked about it saying that if he does not have an attorney, and has no way of paying for an attorney, "an attorney will be here." Dkt. 68-4, Ex. 10. The Spanish speaking agent told Esquivel, in Spanish, that the court can give him an attorney and "[t]hat is, that is going to be in court." *Id.* The Spanish speaking agent then informed him of each right, in Spanish, including stating, "You have the right to have an attorney here present while we talk to you, do you understand?" to which Esquivel responded, in Spanish, "Yes." The agent then informed Esquivel, in Spanish, "If you want an attorney but you don't have one, the court will give you one . . . before speaking, do you understand?" *Id.* Esquivel said, "Yes but," the Spanish speaking agent said "So you do und . . ." and then Esquivel interrupted, "well, for example, in what you just said you said that . . . that I need an a . . . that I can have an attorney here present, even if can't pay for one; does one have to be here or does he not have to be here?" *Id.* The Spanish speaking agent said, "No . . . if they are going to, if they are going to give you one, the court, it will be for court only, do you und . . ." at which point Esquivel interrupted again and said "Ok, cool." *Id.*

First, the request for counsel at the hearing, which amounted to a request for counsel at court under the plain terms of the document submitted as proof, indicates that the defendant invoked to the right to counsel in court at his probable cause hearing. The proceeding was a hearing in front of a Magistrate Judge under Texas Code of Criminal Procedure Article 15.17, and Esquivel's Sixth Amendment right to counsel for the charged offenses (possession with intent to deliver cocaine and firearm charges) attached. *See* Dkt. 68-4, Exs. 5–6. The court paperwork

42

indicates that Esquivel said he wanted a lawyer appointed, and pretrial services was going to help him prepare the request and paperwork.  *Id.*, Ex. 6.  While his Sixth Amendment right had attached and he had requested a lawyer, under *Montejo*, if his *Miranda* waiver was voluntary, knowing, and intelligent, it was sufficient to waive that Sixth Amendment right.  *See Montejo*, 556 U.S. at 786 ("Our precedents also place beyond doubt that the Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent, . . . [and] [t]he defendant may waive the right whether or not he is already represented by counsel"; . . . "when a defendant is read his *Miranda* rights . . . and agrees to waive those rights, that typically does the trick, even though those *Miranda* rights purportedly have their source in the *Fifth* Amendment."); *id.* at 797 ("What matters for *Miranda* and *Edwards* is what happens when the defendant is approached for interrogation, and (if he consents) what happens during the interrogation—not what happens at any preliminary hearing.").

With regard to the Government's argument that Esquivel knowingly waived his Constitutional rights prior to the interrogation because the rights were reasonably conveyed to him, the court finds the statement made by the Spanish speaking officer that counsel will be "for court only" troubling.  A further review of the reason for the holding in *Duckworth* that the *Miranda* warning was not inadequate when a suspect was advised that an attorney will be appointed "if and when he went to court" will be helpful.  In *Duckworth*, police read a suspect in an attempted murder case a waiver form and asked him to sign it.  492 U.S. at 197.  The form stated that the suspect had the right to remain silent, that anything he said could be used against him in court, that he had "a right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning," that he had a "right to the advice and presence of a lawyer even if [he could not] afford to hire one," that the police had "no way of giving [him] a lawyer, but one [would] be

43

appointed for [him], if [he wished], if and when [he went] to court." *Id.* at 198.  The form also advised that he could stop answering questions at any time and had the right to do so "at any time until you've talked to a lawyer." *Id.*  The suspect signed the form; he did not confess at that time and was placed in lock up at police headquarters.  *Id.*  The next day, the police again interviewed the suspect, and read a similar form, though it did not include the caveat about getting a lawyer at court and instead advised that the suspect had the right to consult with an attorney, who may be present, he could stop at any time and request an attorney, and if he did not hire an attorney, one would be provided.  *Id.*  The suspect then confessed to the crime.  *Id.*

On a habeas appeal, the *Duckworth* suspect claimed that his state court conviction should be overturned because his confession did not comply with *Miranda* and was inadmissible.  *Id.* at 199.  The U.S. Supreme Court advised that *Miranda* warnings must convey the rights in *Miranda*, and the initial warnings provided to the *Duckworth* suspect "touched all of the bases required by *Miranda*.  *Id.* at 203.  The Court found that the fact that the police "also added that they could not provide respondent with a lawyer, but that one would be appointed 'if and when you go to court,'" merely described the procedure for appointment of counsel in the relevant state.  *Id.* at 203–04.  The Court noted that "it must be relatively commonplace for a suspect, after receiving *Miranda* warnings, to ask *when* he will obtain counsel."  *Id.* at 204.  It pointed out that *Miranda* "does not require that attorneys be producible on call"; it requires "only that the suspect be informed . . . that he has the right to an attorney before and during questioning, and that an attorney would be appointed for him if he could not afford one."  *Id.*

The statement made by the Spanish speaking agent during Esquivel's custodial interrogation on December 26 was quite different than the statements considered in *Duckworth*.  In *Duckworth*, the suspect was informed that he could not get counsel appointed until he got to

44

court, not that appointed counsel would only be available only in court.  Here, Esquivel was informed that he could have counsel in court; however, the Spanish speaking agent's comments indicated that if Esquivel could not pay for it, he could not get counsel during the interrogation.

"[T]he right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege." *Miranda*, 384 U.S. at 469.  "No effective waiver of the right to counsel during interrogation can be recognized unless specifically made after the warnings" set forth in *Miranda*.  *Id.* at 470.  "In order to fully apprise a person interrogated of the extent of his rights under this system . . ., it is necessary to warn him not only that he has the right to consult with an attorney, but also that if he is indigent a lawyer will be appointed to represent him." *Id.* at 473.  "The warning of a right to counsel would be hollow if not couched in terms that would convey to the indigent . . . the knowledge that he too has a right to have counsel present." *Id.* While "[t]his does not mean . . . that each police station must have a 'station house lawyer' present at all times to advise prisoner," "[i]t does mean . . . that if police propose to interrogate a person they must make known to him he is entitled to a lawyer and that if he cannot afford one, a lawyer will be provided for him prior to any interrogation." *Id.* at 474.  *Not* later at court, but *prior to* the interrogation.  "If the interrogation continues without the presence of an attorney and a statement is taken, a *heavy burden* rest on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination *and* his right to retained *or appointed* counsel." *Id.* at 475 (emphasis added).  "The purpose of the *Miranda* warnings . . . is to dissipate the compulsion inherent in custodial interrogation and, in so doing, guard against abridgment of the suspect's Fifth Amendment rights." *Burbine*, 475 U.S. at 425.

Here, the problem is not that the defendant attempted to invoke the right to counsel, it is that one could infer from the questions to the Spanish speaking agent that he did not understand

45

that he had the right to a free attorney at the time of the interrogation.  He was informed that he had the right to remain silent until he had an attorney, but it seemed like he would only have an attorney *in court*.

In *United States v. Alvarado-Palacio*, the Fifth Circuit recently addressed a case in which a suspect moved to suppress, arguing that "the waiver of his *Miranda* rights was invalid because the agents misrepresented his right to counsel."  951 F.3d 337, 341 (5th Cir. 2020).  The Fifth Circuit noted that the agents informed the defendant of his *Miranda* rights, including the right to consult with an attorney before or during interrogation, and the defendant said he understood the rights.  *Id.*  The defendant also signed the form with the waiver of rights, which was provided in Spanish.  *Id.*  Before returning the signed form, when asked if he understood, the defendant said, "Yes, that I may have an attorney, it says?"  *Id.*  An agent responded, "Yes you may have an attorney, but right now is when we can speak with you."  *Id.*  The defendant then said, "Ah ok." *Id.*  The Fifth Circuit noted that "[n]othing from the record indicates that [the defendant] did not make a free and deliberate choice to waive his right to counsel," and the appeal instead hinged on "whether there was a knowing waiver."  *Id.*

The court first pointed out that a signed waiver form "is 'usually strong proof' of a knowing and voluntary waiver."  *Id.* (quoting *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S. Ct. 1755 (1979)).  The court determined that, considering the totality of the circumstances, the district court's finding that the defendant knew and understood his rights was not clearly erroneous.  *Id.* at 342.  It found it very probative that the defendant read and signed the form with the correct information about his rights and said he understood it.  *Id.*  It also noted that "an officer's misleading statement does not 'invalidate[] the multiple waivers [a defendant] had given *prior* to the interview.'"  *Id.* (quoting *Soffar v. Cockrell*, 300 F.3d 588, 596 (5th Cir. 2002)).  It additionally

46

found that the evidence indicated that the suspect had been fully advised of his right to appointed counsel before his interrogation and did not show that the reference to appointed counsel was linked to a future point in time. *Id.* (citing *Prysock*, 453 U.S. at 360). The court advised that an exchange between law enforcement and a suspect cannot be viewed "in a vacuum" and relied on the fact that the defendant had said that he understood "[j]ust moments before" the incorrect information was stated. *Id.* at 343.

Here, Esquivel read the rights, in Spanish, on his own, and he initialed each one. Dkt. 63; *see also* Dkt. 68-3, Ex. 4 (Gov't Ex. 4) (copy of signed form). The form is in Spanish, and the only evidence of what it says in English is a partial translation of the interview provided by Esquivel in which the agent discusses the rights with Esquivel in Spanish. Dkt. 68-3, Ex. 4. The Spanish form appears to have each of the *Miranda* rights delineated separately; Esquivel initialed each and signed the form. *Id.* The translation of the interview indicates that the Spanish speaking agent told Esquivel, "You have a right to have an attorney here present while we talk to you, do you understand?" to which Esquivel responded, "Yes." Dkt. 68-4, Ex. 10. He also told Esquivel that if he wanted an attorney and did not have money, "the court will give you one . . . before speaking, do you understand?" *Id.* Esquivel said, "Yes but . . . well for example, in what you just said you said that . . . that I need an a . . . that I can have an attorney here present, even if can't pay for one; does one have to be here or does he not have to be here?" *Id.* It is unclear if he was confused about whether there *had* to be an attorney, but then the agent said, "No . . . if they are going to, if they are going to give you one, the court, it will be for court only . . . ." *Id.* This is clearly an incorrect statement of Esquivel's rights under *Miranda*, as under *Miranda* he has a right to an attorney that he does not have to pay if he cannot afford it during the custodial interrogation. However, under *Harrell* the incorrect statement does not vitiate the correct statement earlier that

47

Esquivel had a right to have an attorney there while they talk to him.  He did read each right in his native tongue and initial each right, and he said he understood.  "The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege."  *Colorado v. Spring*, 479 U.S. 564, 574, 107 S. Ct. 851 (1987).  Instead, the Fifth Amendment is meant to protect a defendant from being compelled "to be a witness against himself in any respect."  *Id.*  Here, considering the totality of the circumstances and binding Fifth Circuit and Supreme Court precedent, the court finds that the waiver of Esquivel's *Miranda* rights is valid.  Esquivel's motion to suppress the statements made on December 26 is DENIED.

## IV. CONCLUSION

Esquivel's motion to suppress is GRANTED IN PART AND DENIED IN PART.  It is GRANTED with respect to any statements Esquivel made to police on May 27, 2018, after he was informed that Dedeaux found money in the car and was handcuffed.  The motion to suppress is otherwise DENIED.

Signed at Houston, Texas on November 2, 2020.

Gray H. Miller
Senior United States District Judge